DOMINIC S. SACCA, ADMINISTRATOR OF THE ESTATE OF JOHN SACCA, DECEASED, APPELLEE, v. MICHAEL A. MARSHALL, APPELLANT.

146 N. W. 2d 375

Filed November 18, 1966. No. 36187.

Ginsburg, Rosenberg, Ginsburg & Krivosha and Kier, Cobb & Luedtke, for appellant.

Merril R. Reller and John McArthur, for appellee.

Heard before CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and DITTRICK, District Judge.

DITTRICK, District Judge.

The plaintiff Dominic S. Sacca, administrator of the estate of John Sacca, deceased, commenced this action against the defendant Michael A. Marshall, to recover damages resulting from injuries which caused the death of the deceased, a minor of the age of 14 years. The injuries suffered by the deceased grew out of an accident in which an automobile operated by defendant and a bicycle which deceased was riding collided. The jury returned a verdict for the plaintiff. The defendant filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. The trial court overruled the motion and the defendant has appealed.

The accident happened Saturday, August 15, 1964, approximately 1½ miles northeast of Greenwood, Nebraska, on U. S. Highway No. 6. At the time both defendant's automobile and the deceased's bicycle were traveling on the same and in a northeasterly direction near a bridge across the highway. The deceased was traveling on the highway in the company of two other boys, his twin brother Joseph Sacca and one James Jackson. Each boy was riding a bicycle. James Jackson was riding in front of and Joseph Sacca to the rear

of the deceased. Their intention was to ride their bicycles from Greenwood to Ashland, Nebraska, a distance of approximately 6 miles. The traveled portion of the highway was concrete pavement 24 feet in width. The bridge was 28 feet in width and 82 feet in length. The bridge had concrete banisters or railings, and metal guard rails extended from the end of the banisters a distance of 54 feet to a point on the shoulder of the road 9 feet from the edge of the pavement.

Dominic S. Sacca was the first witness for the plaintiff. He testified that he lived at Greenwood, Nebraska. He was 46 years of age, married, and the father of five surviving children. The deceased was his son and was 14 years of age at the time of his death. He testified that he was the administrator of the estate of John Sacca, deceased. His sons Joseph Sacca and the deceased had permission to make the trip on their bicycles. An acquaintance advised the witness of the accident and took him to the scene. The deceased was then on a stretcher, was placed in an ambulance soon thereafter, and the witness accompanied the driver of the ambulance to a hospital at Lincoln, Nebraska. He did not inspect the surface of the road on his first visit to the scene. Later in the afternoon he returned and saw where glass had fallen on the highway; and that the glass was located about 3 feet from the right-hand side of the road and about 9 feet from the centerline of the highway.

The witness Dominic S. Sacca further testified that prior to the death of the deceased, his family consisted of his wife and six sons. The names and ages of his sons were Don age 16, Joseph and John age 14, Bradley age 6, Nicholas age 5, and Corey age 4. His earnings could not have been sufficient to rear his children without the help of the older children as his family grew up. He had no resources other than the family home and his earnings of $122 per week as a machinist. His 16-year-old son Don was employed at an automobile service station at Greenwood. The son Don earned an average

of $50 per week while attending high school and $60 per week after he discontinued attending school. That out of his earnings the son Don bought some of his own clothes, paid some of the household bills, and assisted the family whenever necessary. The witness testified that he was familiar with wages paid in Greenwood, Lincoln, and Omaha, Nebraska. That a boy in Greenwood, such as his deceased son John, upon reaching 16 years of age would be able to earn $60 per week, and upon reaching 18 years of age could earn $122 per week. That the deceased before his death contributed $6 or $7 per week to the household out of earnings at odd jobs.

On cross-examination it was developed that the deposition of the witness Dominic S. Sacca had been taken. In such deposition he testified that he first returned to the scene of the accident on the following Monday. When he first went to the scene he had not looked for anything and remained only long enough to place his son in an ambulance. On Monday the only thing he observed was a piece of headlight on the right shoulder of the road about 30 feet from the bridge. On redirect examination the witness testified that he made three trips to the scene, the first soon after the accident, the second during the afternoon of the same day, and the third the following Monday.

On cross-examination it was also developed that in his deposition Dominic S. Sacca testified further as follows: His oldest son worked at a filling station 3 hours or so a day and himself spent his earnings; his sons kept their earnings and whatever money they earned was their spending money; and his sons had an allowance.

Betty Jean Sacca, the mother of the deceased, was called as a witness for the plaintiff. She testified that the deceased helped with the normal household duties. Outside the home he mowed lawns, scooped snow, and did yard work for others. A share of his earnings were used for his own spending money. From his earnings he contributed an average of $6 per week to the family

budget. He bought clothes and school supplies for himself. As the deceased grew older he would have earned and helped the family more. On cross-examination the witness stated that her deposition had been taken; and that in such deposition she testified that her sons kept their earnings for spending money or little things she and her husband could not have obtained for them.

One James Armstrong, a road contractor and engineer, testified for the plaintiff as follows: He went to the scene of the accident at about 4:30 p.m. on August 15, 1964. He observed glass and skid marks on the pavement. A person present assisted him in making measurements with a tape. Three feet from the right side of the pavement facing Ashland, and 19 feet from the abutment he observed broken glass, pieces of headlight, chrome, and skid marks. The glass covered an area 6 inches wide and 3 feet in length.

Virgil Tweton, the town marshall of Greenwood, was called as a witness for the plaintiff. He testified that he investigated the scene of the accident. He observed glass on the right-hand side of the pavement but he could not tell where.

Joseph Sacca, the twin brother of the deceased, testified for the plaintiff as follows: That as James Jackson, the deceased, and the witness were approaching the bridge they were riding bicycles in single file, about 20 feet apart on the right side of the highway, and about 3 feet from the edge of the pavement. He was about 6 feet from the bridge when a car approached from the opposite direction. After the oncoming car had passed he heard a car coming from the rear. The car sounded close and he turned around to see how far it was from him. The other two bicycles were then straight ahead of him. The car when it passed him was very close, a distance of about a foot or 5 or 6 inches, and was traveling on the right-hand side of the highway. As it passed him the car turned toward the other bicycles. The right front headlight of the car hit the middle of the

bicycle his brother John was riding. The bicycle was thrown to the right shoulder of the road, and landed in the grass of the shoulder approximately a car length from the pavement. After the impact the car changed its course to the left. His brother, the deceased, did not suddenly turn his bicycle in any direction. The car was traveling from 55 to 60 miles per hour. The driver of the car did not sound his horn.

On cross-examination the witness Joseph Sacca testified that when he stated on direct examination that the car was 5 or 6 inches from him when it passed he meant 5 or 6 feet. It was further developed on cross-examination that the deposition of the witness had been taken and that in such deposition he testified as follows: When the car passed him it was 5 or 6 feet to his left. The car continued straight up the highway. At the time it was hit, the bicycle was at an angle and the car was going straight ahead. His brother was not near the centerline at the time of the impact. The part of the deposition made a part of the record reflects the following questions propounded to the witness and the answers thereto: "Q. What direction was the bike facing when it was hit? A. When it was hit? Q. Yeah. A. It was— the car was straight ahead and his bike was sort of an angle. Did you give that answer to that question? A. Yes. * * * Q. Was it kind of like a 45-degree angle across the road? A. You mean, after the bike—. Did you give that answer to the question? A. Yes. * * * Q. Now, was your brother near the center line of the road when this accident took place?—when the impact took place. A. No. * * * Q. How close was he to the center line? A. After impact, you mean? And my question was, No. At about the time of impact. A. I don't think he was quite halfway across the highway. I think he was mostly on this side of the road. Did you give that answer to that question? A. Yes. * * * Q. Did he ever swerve to the right or left before the accident? A. Not that I saw."

On redirect examination the witness testified his answer to the last question had reference to his brother. Further, that when he testified the bicycle was at an angle he meant when it was on the car.

James Jackson, one of the three boys who were riding the bicycles, testified for the plaintiff. He testified that they met a car coming from the opposite direction when they were near the bridge; and that he was just past the middle of the bridge when the car went by him. About the same time he heard a car approaching behind them. He glanced back as he was coming off the bridge and noticed the deceased was then about 30 feet behind him. He saw the car hit the deceased. There was no turn. As the car passed him the deceased was on the right front fender and the bicycle was along the side of the car with the left-hand portion of the handle bars in the headlight. After the car passed him the bicycle flew onto the right shoulder of the road and the deceased remained on the fender of the car for about half a block. The bicycle landed about three car lengths ahead of him. At the time of the accident they were riding in single file about 3 feet from the edge of the pavement, and the deceased was approximately 30 feet behind him.

Vernon O'Neal, a trooper with the Nebraska Safety Patrol, was called as the first witness for the defendant. He testified that he received word of the accident at 11:25 a.m. He proceeded immediately to the scene and made an investigation. He observed no glass or debris on the surface of the bridge. He observed two skid marks beginning 75 feet east of the bridge, the left mark starting on top of the centerline and the right skid mark near the center, or slightly to the left of the center, of the right-hand lane. About 35 to 40 feet east of where the skid marks curved across the centerline he observed bits of glass scattered in both lanes with no particular pattern. This was the only glass he observed in the area. The skid marks veered to the left, across the

pavement, onto the grass on the left and north shoulder of the road, from where they proceeded on the shoulder of the road a distance of 138 feet, where they veered to the right, across the pavement to the right and south. The defendant's car came to rest on the south shoulder of the road. The deceased was lying near the center of the pavement, 160 feet from the starting point of the skid marks. There was a total of 219 feet of skid marks.

William D. Barber, a witness for the defendant, testified that prior to the accident he approached the bridge in his automobile traveling in a southwesterly direction. The boys on their bicycles were approaching, riding back and forth across the highway. He sounded his horn after which they rode near the right-hand edge of the pavement. He was about 10 feet east of the bridge when he met and passed the boys. He observed the defendant's car approaching and going in the same direction as the boys. He met and passed defendant's automobile as the automobile of the witness was leaving the west side of the bridge and defendant's automobile was entering that side. The witness further testified that he observed the accident through his rearview mirror. The defendant's automobile after it crossed the bridge began to pull to the left. He saw the deceased veer to the left and north at an almost 90-degree angle. The defendant's automobile and the bicycle of the deceased collided on the centerline of the highway. The witness turned his car around and went back to the scene of the accident. The deceased was lying in the center of the highway about 140 yards from the east end of the bridge.

Virgil Tweton, the town marshal of Greenwood, was called as a witness for the defendant and testified that he observed the tire marks and assisted highway patrolman O'Neal in making measurements.

The defendant Marshall testified that he was about one quarter of a mile from the bridge when he first observed the Barber car and the bicycles. He was then

going approximately 55 miles per hour. He reduced his speed to 40 or 45 miles per hour. When the horn of the Barber car was sounded the boys pulled over in single file to about 1 foot from the bridge railing. When he arrived at the east end of the bridge the boys were just clearing the east end of the guard rail. He was gaining on the boys quite rapidly. The left wheel of his car was then approximately at the centerline of the pavement. As he arrived near them the deceased swung out at about a 45-degree angle across the highway. The witness then immediately veered to the left and applied his brakes. The headlight of his car struck the portion of the bicycle behind the front wheel. He did not sound his horn.

It is argued as a ground for reversal that the trial court erred in not granting defendant's motion that the plaintiff's petition be dismissed or in the alternative that a verdict be directed for the defendant for the reason the evidence was insufficient to support a verdict for the plaintiff. In support thereof the defendant cites Lindelow v. Peter Kiewit Sons', Inc., 174 Neb. 1, 115 N. W. 2d 776, in which case this court stated the following rule: "A mere scintilla of evidence is not enough to require the submission of an issue to the jury." The defendant also cites Kohl v. Unkel, 163 Neb. 257, 79 N. W. 2d 405, where this court held: "Where the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question, as a matter of law, rather than submit it to a jury for determination." The defendant further contends that the rule stated in Bixby v. Ayers, 139 Neb. 652, 298 N. W. 533, applies to the instant case. In that case we held: "The competent relevant testimony of unimpeached witnesses should not be held to be contradicted by inferences from circumstantial evidence, unless these circumstances and the natural inferences to be adduced therefrom cannot

in reason be reconciled with the conclusion that the direct evidence is true."

The testimony of Joseph Sacca and James Jackson, witnesses for the plaintiff, was to the effect that the deceased did not turn to the left prior to the accident. The defendant and his witness William D. Barber testified that immediately before the accident the deceased veered suddenly to the left. Whether the bicycle of the deceased veered to the left before the accident was one of the main disputed questions of fact. In this respect the evidence of the plaintiff and defendant was in direct conflict. As stated in Trask v. Klein, 150 Neb. 316, 34 N. W. 2d 396: "A verdict based upon conflicting evidence will not be reversed on appeal if there is evidence from which reasonable minds might draw different conclusions."

In the light of all the evidence disclosed by the record we conclude that the trial court was correct in submitting the case to the jury.

The defendant contends that the trial court failed to instruct the jury respecting the law applicable to material issues raised by the pleadings and supported by the evidence. In Bixby v. Ayers, *supra,* this court stated: "Assuming that a bicycle is a 'vehicle,' as that term is used in our statutes, and as such upon public highways equal in right to that enjoyed by motor vehicles, it would seem that they are equally subject to the law of the road. * * * Bicyclists while traveling on the highway are controlled by the rules of the road as recognized at common law. They have the same right as automobile drivers to use streets and roads and are chargeable only with such ordinary care for their own safety as prudent persons of like age and experience would exercise."

The following are cases which hold that a bicycle is a "vehicle" subject to a vehicle code: Wright v. Sniffin, 80 Cal. App. 2d 358, 181 P. 2d 675; Miller v. Keller, 263 Wis. 509, 57 N. W. 2d 711; Van Dyke v. Atlantic Greyhound Corp., 218 N. C. 283, 10 S. E. 2d 727.

The instructions of the trial court defined the duty of the driver of a motor vehicle to keep a proper lookout and to have his vehicle under proper control. No instruction was given defining the duty of the operator or driver of a bicycle to do the same. We hold that a bicycle is a "vehicle" as that term is used in our statutes setting forth rules of the road. We further hold that the failure of the trial court in this case to instruct on the duty of a bicyclist to maintain a proper lookout and control was reversible error.

Instruction No. 7 given by the trial court is as follows: "You are instructed that the laws of Nebraska, in full force and effect at the time and place of the accident herein concerned, provide that no person shall turn a vehicle from the direct course upon a highway unless such movement can be made with reasonable safety and after giving an appropriate signal in the event any other vehicle may be affected by such movement. Such signal of intention shall be given continuously during *not* less than the last *50* feet traveled by the vehicle before turning." (Italics supplied.)

In Omey v. Stauffer, 174 Neb. 247, 117 N. W. 2d 481, this court held: "An instruction relating to the duty to give an appropriate signal before turning a motor vehicle from a direct course upon a highway is incomplete if it fails to instruct as to the signals which are authorized and required."

Instruction No. 7 heretofore set forth failed to instruct as to the signals required by the statutes. See, §§ 39-7,116 and 39-7,117, R. R. S. 1943, and 39-7,115, R. S. Supp., 1965. The failure so to do in the light of the rule set forth in Omey v. Stauffer, *supra,* and our further holding that bicyclists are subject to the rules of the road, constituted reversible error.

Instruction No. 11 given by the trial court is as follows: "You are further instructed that if you find from the evidence that the defendant driver violated any provision of the statutes of the state of Nebraska, set forth

in these Instructions, that the violation thereof, in and of itself, would not be negligence on the part of said violator, but would be evidence of negligence on his part to be considered by you, together with all other evidence, facts and circumstances in the case to determine whether such violator was guilty of negligence."

Instruction No. 11 applied only to the defendant driver. No similar instruction was given as to the effect of the violation of the statutes by a bicyclist, and the failure to give such instruction was likewise reversible error.

The defendant further urges as a ground for reversal the giving of the following instruction No. 3: "You are further instructed that the burden is upon the defendant to prove, by a preponderance of the evidence, all of the material affirmative allegations of his answer, and particularly that the decedent John Sacca was guilty of contributory negligence proximately causing the accident as claimed by him, except so far as the same may appear in the evidence adduced by the plaintiff, if such is the fact. If you first find that the defendant was negligent as claimed by the plaintiff, but that the decedent John Sacca was also guilty of contributory negligence causing the accident, you will then turn your attention to the instructions on comparative negligence, hereinafter given you, to determine whether or not the plaintiff shall recover in this action against the defendant."

The trial court properly instructed as to the plaintiff's burden of proof and as to contributory negligence. In instruction No. 4 the trial court defined proximate cause as follows: " 'Proximate cause,' as used in these Instructions, is that cause from which the result follows as a natural or probable consequence. It is the primary cause where no intervening cause, disconnected therefrom and self-operating, intervenes to produce the effect."

The defendant contends that the effect of instruction No. 3 is to say that contributory negligence to be a defense must be the sole proximate cause of the accident.

We do not agree. Instruction No. 3 was properly given when considered in conjunction with the other instructions mentioned as to the plaintiff's burden of proof, contributory negligence, and the definition of proximate cause.

The defendant contends that it was error for the trial court to give instruction No. 13, which is as follows: "You are instructed that very young children cannot be legally charged with either negligence or contributory negligence, and that what is required of other children is the exercise of that degree of care which an ordinarily prudent child of the same capacity to appreciate and avoid danger would use in the same situation. There is no arbitrary rule fixing the age or time at which a child, during its minority, may be wholly capable or incapable of understanding and avoiding dangers encountered while traveling upon a public highway; and whether or not negligence may be attributed to the minor, John Sacca, in this case is a matter for you to determine by an examination of all of the facts and circumstances shown by the evidence. In this connection, you are further instructed that if you determine that John Sacca cannot be charged with either negligence or contributory negligence because of his age, nevertheless, if his acts, whether negligent or not, were the proximate cause of his own injuries, there can be no recovery from the defendant in this case."

In the case of Bear v. Auguy, 164 Neb. 756, 83 N. W. 2d 559, this court held that whether or not a minor between 14 and 15 years of age is of sufficient knowledge, discretion, and appreciation of danger that he may be subject to the defense of contributory negligence is generally a question of fact and not of law. In that case the court stated that the conduct of the plaintiff should not, his age considered, conclusively bar his right to recovery, conceding that he was a bright and intelligent boy, had lived in Omaha, was acquainted with the use of bicycles as most boys are, and was familiar with the

operation of motor bicycles, having ridden thereon with other boys, although this was the first occasion upon which he had operated one. We therefore conclude that instruction No. 13 was properly given by the trial court.

Defendant contends that by reason of the nature of the contradictions contained in the testimony at the trial and in the depositions of Dominic S. Sacca and Joseph Sacca, witnesses for the plaintiff, the court on the defendant's motion should have directed a verdict for the defendant. In support thereof defendant has cited the cases of Gormley v. Peoples Cab, Inc., 142 Neb. 346, 6 N. W. 2d 78; Gohlinghorst v. Ruess, 146 Neb. 470, 20 N. W. 2d 381; and Rahfeldt v. Swanson, 155 Neb. 482, 52 N. W. 2d 261. The foregoing cases adopted the rule that where a plaintiff, without reasonable explanation, testifies to facts materially different concerning a vital issue, the change clearly being made to meet the exigencies of the pending action, the evidence is discredited as a matter of law and should be disregarded. We have examined the record and a résumé of the testimony of the witnesses does not disclose that their testimony falls within the rule stated. It is further to be noted that in each of the three cases cited the contradictory statements were made by a party litigant. Under the circumstances and record of this case the jury had the right to take into consideration the contradictory statements of the witnesses as bearing on their credibility.

The last assignment of error of the defendant is that the evidence of the amount earned by the deceased, and what he would be able to earn in the future during his minority, was speculative and should not have been admitted over objection. The trial court properly instructed the jury as to the measure of damages. There is no contention by the defendant that the verdict was excessive. The evidence adduced by the plaintiff reflects the status of the family and of the deceased, the income and assets of the father and mother, the number

of children, their earnings and contributions, and that the deceased assisted with the normal household duties. Section 38-107, R. R. S. 1943, provides that parents are equally entitled to the services and earnings of their minor children. In Dorsey v. Yost, 151 Neb. 66, 36 N. W. 2d 574, 14 A. L. R. 2d 544, this court said: "The amount being very problematical, it is peculiarly for the jury to determine, after hearing all the evidence bearing upon the situation, including the parents' position in life, the physical and mental condition of the child, his surroundings and prospects, and any other matter that sheds light upon the subject." We conclude that the admission of the evidence mentioned to which the defendant made objection did not constitute prejudicial error.

For the reasons stated, the judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.