MARGARET CULLINANE, SPECIAL ADMINISTRATRIX OF THE ESTATE OF SHAWN CULLINANE, DECEASED, APPELLANT, V. INTERSTATE IRON & METAL, INC., A NEBRASKA CORPORATION, ET AL., APPELLEES.

343 N.W.2d 725

Filed January 20, 1984. No. 82-729.

Norman Denenberg, for appellant.

Thomas J. Walsh, Jr., of Walsh, Walentine, Miles, Fullenkamp & O'Toole, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

WHITE, J.

This is a wrongful death action brought by the special administratrix of the estate of Shawn Cullinane, plaintiff-appellant, against Interstate Iron & Metal, Inc. (Interstate), and Sam Bittner, defendants-appellees. Plaintiff contends that Interstate, through its owner, Sam Bittner, was negligent in failing to properly maintain a building located at 2900 B Street, Omaha, Nebraska, and that this alleged negligence was the proximate cause of Shawn Cullinane's death. The district court for Douglas County, at the conclusion of plaintiff's case in chief, sustained the defendants' motion for a directed verdict. We reverse and remand.

We review the facts, noting that, in light of the directed verdict in favor of defendants, the plaintiff is entitled to have all competent evidence adduced on her behalf treated as true, to have every controverted fact resolved in her favor, and to have the benefit of every inference that can reasonably be drawn from the evidence. *Bank of Valley v. Mattson*, 215 Neb. 596, 339 N.W.2d 923 (1983).

In February 1981 Interstate, a Nebraska corporation, acquired a 6-acre tract of land located in the

vicinity of 2900 B Street, Omaha, Nebraska. This property was formerly the Allied Mills plant, and although not located in a highly populated area of the city, there is residential property in the immediate area.

The property contained a series of structures, including a grain elevator and approximately seven other buildings. Attached to the grain elevator, on the north end of the property, was a two-story building in which the accident in question occurred. On March 19, 1981, Sam Bittner, in his capacity as president of Interstate, contracted with Patrick Cox and Frank Bode for the sale of the scrap steel located in this building. This contract is set forth in pertinent part as follows:

"MARCH 19, 1981
INVOICE
TO: FRANK BODY [sic] and PAT COX d/b/a BODY [sic] CONSTRUCTION 105 Longview Route 4, Council Bluffs, Iowa 51501
SOLD: All scrap steel in Building 12, 2900 'B' Street Omaha, Nebraska, 68105.
TERMS: $5,000.00 payable as follows: $2,000.00 down $3,000.00 balance when starting lower floor of two story building. Waiver signed and made a part of this invoice."

Cox and Bode later entered into an agreement to sell Thomas Cullinane, the father of the deceased, a portion of the steel removed from the building. At approximately 6:30 a.m. on Saturday, May 2, 1981, Thomas Cullinane, accompanied by his 10-year-old son, Shawn, arrived on the premises. Thomas Cullinane was there to assist Cox and Bode with the removal of the steel beams, and intended to go to Des Moines, Iowa, later that day. Thomas Cullinane parked his pickup truck approximately 100 to 150 feet away from the building. At approximately 8:15 a.m. the crane arrived to be used for loading the steel beams onto trucks. Thomas Cullinane told his son to stay in his pickup while he assisted the other

workers on the top floor of the two-story building. At approximately 9 a.m. Shawn went up to the second floor of the building where the men were working. Thomas Cullinane instructed his son to return to the pickup truck, as it was dangerous for Shawn to be there. Shawn obeyed and returned to the truck. Later that morning, however, Shawn apparently re-entered the building and fell through one of the open holes on the northwest portion of the second floor. At approximately 10:15 a.m. Sam Bittner and another employee of Interstate discovered Shawn's body on the lower level of the building directly under a 24-inch-square opening located on the second floor. Shawn was then taken to St. Joseph's Hospital, Omaha, Nebraska, where he died 26 hours later.

The facts that the building in question was not fenced or secured, that there were no warning signs present, and that the numerous holes on the second floor were for the most part uncovered are undisputed. It is also undisputed that prior to the accident both Sam Bittner and Thomas Cullinane knew of the unguarded holes and their potential hazard, especially if children were present.

At the close of plaintiff's case in chief, the trial court directed a verdict for the defendants, ostensibly on the theories that Interstate and Sam Bittner had relinquished possession and control of the building to Cox and Bode, and, consequently, whatever liability, if any, that existed would be their liability, not defendants' liability; that Shawn Cullinane was contributorily negligent as a matter of law; and that the "attractive nuisance" doctrine was not applicable to the facts of this case.

From our review of the record we conclude that it was error for the trial court to hold, as a matter of law, that defendants relinquished all possession and control of the building. The contract defendants entered into with Cox and Bode was not for the sale of the entire building but, rather, only for the scrap steel in the building. Cox and Bode had no right to

remove any other material from the premises. Of further interest is the fact that Cox and Bode never removed the steel from the first floor of the building. In fact, after the accident occurred, Sam Bittner would not allow Cox and Bode to remove that steel. Defendants later sold the first floor steel to another party. Although it is true, as defendants contend, that they had no control over the method in which the steel was removed, Sam Bittner and other Interstate employees entered the building at least once during the period in which the removal of the steel was taking place. This evidence adduced by plaintiff at trial would permit a jury to find that defendants had not relinquished *exclusive* possession and control of the building to Cox and Bode.

On the issue of Shawn Cullinane's contributory negligence, the standard of care to which a child must conform was set in *Huff v. Ames*, 16 Neb. 139, 141, 19 N.W. 623, 624 (1884): " '[T]he rule as to contributive negligence of a child is, that it is required to exercise only that degree of care which a person of the age of this plaintiff would naturally and ordinarily use in the same situation and under the same circumstances.' "

In 1917, and still applicable today, we held in *Rule v. Claar Transfer & Storage Co.*, 102 Neb. 4, 165 N.W. 883 (1917), that, as a general rule, whether a child 11 years of age is of sufficient knowledge, discretion, and appreciation of danger that he may be held guilty of contributory negligence is a question for the jury to determine. See, also, *Camerlinck v. Thomas*, 209 Neb. 843, 312 N.W.2d 260 (1981); *Sacca v. Marshall*, 180 Neb. 855, 146 N.W.2d 375 (1966).

The fact that the holes in the second floor presented a hazardous condition of which Sam Bittner was aware is uncontroverted. During direct examination Paul Behounek, an employee of Interstate, testified as follows: "Q. Was there — On these three occasions when you walked over to the building with Sam, was there ever anything said

about those holes? A. Yes, Sam said, 'Watch your step on the holes' everytime we'd go in, and he said, 'They really ought to be covered,' but they never did get covered.''

Another witness who had been in the building on several occasions testified that he had almost walked into one of the holes himself. This issue of Shawn Cullinane's contributory negligence, or the degree thereof, should have been submitted to the jury.

Defendants argue, and the trial court found, that the "attractive nuisance" doctrine does not apply to this case. The Restatement (Second) of Torts § 339 (1965), which has been adopted in Nebraska, sets out the five elements necessary for a child to meet in order to recover from a possessor of land: "(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

"(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

"(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

"(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children." *Id*. at 197. See, *Davis v. Cunningham*, 196 Neb. 8, 241 N.W.2d 343 (1976); *Gubalke v. Estate of Anthes*, 189 Neb. 385, 202 N.W.2d 836 (1972).

Defendants contend that because Shawn was brought to the premises by his father, he was not "attracted" to the dangerous condition. Defendants further contend that the proximate cause of Shawn's

death was not the condition of the building but, rather, the negligence of the father in failing to properly supervise his son.

Although the evidence is clear that Thomas Cullinane did indeed bring Shawn onto the premises where the building was located, it is just as clear that Mr. Cullinane did not bring Shawn onto the second floor of the building where the accident occurred. We need not speculate as to the possible reasons why Shawn reentered the building after he was warned to remain in the pickup truck; suffice it to say that Shawn's father did not bring him to the second floor of the building where the accident occurred.

Finally, on the issue of Thomas Cullinane's supervision of his son, we again find that this question should have been submitted to the jury. The law is well established in Nebraska that where there are issues as to the existence of negligence, contributory negligence, and proximate cause of an injury, those issues must be submitted to the jury. *City of Omaha v. Houlihan*, 72 Neb. 326, 100 N.W. 415 (1904); *Holly v. Mitchell*, 213 Neb. 203, 328 N.W.2d 750 (1982).

REVERSED AND REMANDED.

BOSLAUGH, J., dissenting.

The building in which Shawn Cullinane was fatally injured was located on a 6-acre industrial tract and was in the process of being demolished. A different standard of care is applicable to the owner of a building which is undergoing demolition.

An owner of a building being demolished owes no duty to keep the building in repair even to those properly within it. "It would be an absurdity to say that a building must be kept in repair while being demolished." *Matthews v. Southern Amusement Company*, 199 So. 2d 403, 404-05 (La. App. 1967). See, also, *Atkins v. Urban Redevelopment Auth., etc.*, 263 Pa. Super. 37, 396 A.2d 1364 (1979).

The rule is similar to that applicable to a street or highway under construction or repair. The duty to

keep the highway in reasonably safe condition for travel is remitted during the time when repairs or improvements are in progress. *Bruno v. Gunnison Contractors, Inc.*, 176 Neb. 462, 126 N.W.2d 477 (1964); *City of Lincoln v. Calvert*, 39 Neb. 305, 58 N.W. 115 (1894). The duty then is to warn the public that the highway is under construction or closed.

In *Neal, Admr. v. Home Builders, Inc.*, 232 Ind. 160, 111 N.E.2d 280 (1953), it was held not feasible to barricade a semiconstructed building so as to prevent trespasses by children. The court stated at 188-89, 111 N.E.2d at 294: "We believe it equally true in the case at bar that any barricade at the entrance to the semi-completed house, of sufficient size and strength to keep children out of the building, would destroy the very purpose for which the opening is maintained during the construction of the building. It is common knowledge that carpenters and other workmen use such openings as a means of ingress and egress into and out of the building in the performance of their duties in connection with the construction thereof, and to require them to remove and replace the barricade every time they went in or out of the building would delay its completion and place an undue burden on the owner of the property. *Chicago, etc. R. Co.* v. *Fox* (1906), 38 Ind. App. 268, 275, 70 N.E. 81.

"The owner or builder of a dwelling house is not an insurer of the safety of children who come upon or into the building while under construction either as trespassers or licensees, by permission or sufferance, for the purpose of play.

" 'The simple fact that a child *non sui juris* is injured will not import negligence to a defendant. It may be argued that a child of tender years is incapable of protecting itself and hence the law imposes the duty upon landowners. The primary duty of protecting children by nature and by law devolves upon their parents who have legal power to control their actions and whose moral duty it is to keep their

children from entering upon dangerous premises— an obligation equal at least to the moral obligation of the landowner to fence them out.' *Holstine* v. *Director, etc. Railroads* (1922), 77 Ind. App. 582, 594, 134 N.E. 303, *supra.*"

Shawn did not enter the building with the express or implied consent of the owner. As such he was a trespasser or bare licensee, since he had been brought to the property by his father. Generally, the only duty owed to a trespasser is to refrain from willfully or wantonly injuring him. *Bosiljevac v. Ready Mixed Concrete Co.*, 182 Neb. 199, 153 N.W.2d 864 (1967).

This is not a case of a child attracted to a building under circumstances where the owner should have realized that children would be likely to trespass and not realize the seriousness of the risk, and in which the burden of eliminating the danger was slight as compared to the risk.

No question of warning is involved, since Shawn had been instructed by his father not to enter the building because of the danger involved.

HASTINGS and CAPORALE, JJ., join in this dissent.