DEPARTMENT OF BANKING OF THE STATE OF NEBRASKA, AS RECEIVER OF NEBRASKA STATE BANK OF VALENTINE, VALENTINE, NEBRASKA, INSOLVENT, APPELLEE, v. EUGENE P. KEELEY, APPELLANT.

156 N. W. 2d 803

Filed March 1, 1968. No. 36665.

Fitzgerald, Brown, Leahy, McGill & Strom, for appellant.

Murphy, Pederson & Piccolo and Smith Brothers, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

This is an action by appellee against appellant, as guarantor of a note. The defense is fraud and partial failure of consideration. After both parties had rested, the trial court directed a verdict for appellee, and appellant perfected this appeal.

The note, in the amount of $25,220, dated October 19, 1964, due November 5, 1964, is signed "Valentine Hearts Per E. P. Keeley President," and on the back thereof bears the following endorsement and guaranty: "I hereby endorse this note with full personal recourse and unconditionally guaranty the payment of same for the principal amount and any and all interest that becomes due and payable

"E P KEELEY (Sgd.)
"E. P. Keeley
"Valentine, Nebraska
"October 19, 1964."

The baseball team which has represented Valentine in the league embracing teams in the area for several years has been nicknamed "Valentine Hearts."

On April 7, 1956, Valentine Baseball Association, Inc., was formed for the purpose of organizing and maintaining a baseball club. Appellant was its president, one of its directors, and the resident agent. The baseball club was operated under appellant's direction through the

1959 season. On June 28, 1960, a new corporation was organized, under the name of "Valentine-Winner Baseball Club, Inc.," to operate a baseball club. Appellant had no connection with this corporation or with the ball club. On May 11, 1963, a new corporation was formed, with the name "Valentine Hearts, Inc." The incorporators were the appellant and Dwight E. Dam, both residents of Valentine, Nebraska. The initial directors were the two incorporators and R. L. Davenport, the president of the Nebraska State Bank of Valentine. Appellant was its registered agent.

Prior to the incorporation of Valentine Hearts, Inc., a meeting had been held at an inn in Valentine, to decide whether to have baseball for another year. Fifteen or twenty citizens of the area, including Davenport, Dam, and appellant were present. The talk centered around financing the team and who was to run it. Dam testified that the concensus of the meeting was that a document should be prepared to be signed by those interested in underwriting the operation of the baseball team for 1963. Dam was to get the agreement prepared, and Davenport was supposed to circulate it. Appellant consented to "carry the ball," as he had done previously. Dam had the agreement drawn but did not deliver it to Davenport. He understood the attorney who drew it did so. Dam never saw the agreement, but testified he talked to Davenport about it a short time subsequently, and was told about 40 signatures had been obtained. Dam relayed this information to appellant. Dam had not signed the agreement and knew of some others who were interested who had not done so, but never visited with Davenport about it again.

Appellant, who had wide experience in business and financial affairs, was the implement dealer in Valentine. He had transacted his personal and business banking with the Nebraska State Bank of Valentine for several years before Davenport, who was a close personal friend, became its president. During the period from 1956 to

1959, as the active manager of the ball club, appellant accumulated a debt of $14,000. This was evidenced by a promissory note dated September 27, 1958, for that amount. On the record, we determine this note was personally guaranteed by appellant. The history of this transaction from September 27, 1958, to January 5, 1963, is as follows: The note was renewed March 28, 1959, and October 15, 1959. It was renewed January 30, 1960, at which time interest in the amount of $247.33 was paid by a check of the Keeley Implement Company. It was renewed again on the following dates, and the amount indicated is the interest which was paid by a check of the Keeley Implement Company: August 26, 1960, $487.67; January 9, 1961, $317.33; June 15, 1961, $366.33; January 6, 1962, $478.33; and July 11, 1962, $434. On January 5, 1963, appellant paid $1,000 on principal, and interest in the amount of $21, with his personal check.

Between May and July 16, 1963, the Nebraska State Bank of Valentine advanced $2,000, $5,000, and $6,000 to the ball club on three separate notes. Appellant does not remember whether he personally guaranteed these notes, and the bank records would indicate that they were delivered to him when they were subsequently renewed. Davenport testified the notes were guaranteed by appellant. On July 16, 1963, the three notes were consolidated into one for $13,000, and this note was guaranteed by appellant. Appellant testified that he had a conversation with Davenport about the indemnity agreement, as follows: "A On that occasion he told me he had around 42 names on it. I says, 'Dick, I haven't signed it. I would like to get on it.' And he said, 'It's at home, and it's not in the bank at the present time.' " Appellant did not discuss the agreement with Davenport again until December 1963, when Davenport suggested the combining of the old note with the current one. Appellant testified that on that occasion when he asked Davenport to see the agreement Davenport told him it was in the glove compartment of his pickup out at the trout farm.

On December 18, 1963, appellant paid $2,000 on the current note, and interest on both notes, from the baseball account and signed and guaranteed a new note for $24,000, which consolidated the old and the current indebtedness. This $24,000 note, which was due June 18, 1964, was renewed on October 19, 1964, by the execution of a new note for $25,220, which included the interest on the indebtedness to that date. This note, which is the one on which the present action is founded, was due and payable on November 5, 1964, a little more than 2 weeks thereafter.

Preceding this transaction, a clerk at the bank had called appellant's office and requested a financial statement. Appellant called Davenport and visited with him about it. This was on Saturday afternoon, October 17, 1964, and Davenport suggested that appellant come into the bank the 19th. Appellant did so, and noticed that the bank was in the process of being examined by either the state or national examiners. His report of the transaction on that occasion is as follows: " 'Mr. Davenport told me on a Saturday, which I believe was the 17th of October, to come to his office. He wanted to get a combined property statement. I called him back and told him I would be down in a few minutes. Mr. Davenport said, "It's about a quarter till three now, why don't we make it ten o'clock on Monday morning." I appeared at the bank approximately ten o'clock on Monday morning on the 19th. At the time I got to the bank Mr. Davenport was not present. I asked Betty Porath—or Mrs. Porath where Dick was, and she said he was out getting coffee. He wants to see you, will you please wait. I waited for approximately 15 minutes, when Mr. Davenport returned, with whom I presumed was the bank examiners. He had four or five other people with him. I waited for maybe another five or six minutes, until somebody in Mr. Davenport's office, and I presume it was the bank examiner, left the room. He called me in, and we had a little general conversation about difference (differ-

ent) things. And he says, "Mr. Keeley," he says, "I would like to get a financial statement from you. A good financial statement." Those were his words. I says, "Dick, you have. What is this all about? You have Keeley Implement Company, Incorporated." He says, "No, I want a good financial statement to support the baseball note." And there was some other conversation that went on. I figured he had enough financial statements to back up the baseball note. He says, "Well, help me out on this one particular instance here." And I says "Well, if a financial statement—a combined financial statement of E. P. Keeley Company and Keeley Implement Company will help you," I says, "well, I will give you a financial statement." And so he takes a piece of paper in longhand, and he starts writing down different figures. And he says, "What do you think your accounts are?" And we went through the Keeley Implement Company, and I gave him some figures. He was inclined to raise them all. We come over to the other property, and he would raise them. He says, "What is your house worth?" I says, "$10,000.00." He says, "We'll put her down at $20,000.00." I think or some other figure, and we kidded around about the financial statement. And he handed it to Mrs. Porath to type up. I looked at it, and we kidded around a little bit, and I said, "Dick, I will sell you the joint for that." So Mrs. Porath went out and she brought in the note. Now, he says, "I need a renewal on this note." I says, "Dick, you know the story on this note. You and Mr. Dam was to take full financial responsibility. You tell me that you have guarantors to back up the note. Responsible people. The agreement was delivered to you." Well, Dick says, "We know about that, but I need a little more time." He says, "Will you give me two weeks to clean up this mess?" So I says, "Well, two weeks won't be bad, but," I says, "I want the mess cleaned up. I want you to live up to your promise to come up with the agreement. Call these people to a meeting and we will pay off the note as

agreed." He says, "Thats okay with me. You set the meeting. You set the date." So at that time Mr. Ferris, Sr., was interested in and had operated the nonincorporated Valentine Hearts in 1964, and when I walked out of the bank he was standing at the curb. I said to Fud, "It looks like we are going to get the note mess cleaned up. Dick has promised to appear at a meeting and bring the list of guarantors." I said, "Fud, I'll leave it up to you to call the meeting, because you're active in baseball at the present time." Fud, Sr., says, "When do you want it?" And I said, "It has to be within two weeks. How about a week from tomorrow night, which would be a Tuesday?" Fud says, "I will let you know. I will check with the local calendar." In those days we didn't call a meeting if there was a basketball game or something like that. He says, "I'll set up the meeting." And to the best of my recollection the meeting never got called. The bank closed within the two-week period. The bank closed within that two weeks. This was the 19th, and it closed the night of the 29th.' "

Davenport, whose testimony was adduced by deposition, testified that all of the previous baseball notes were guaranteed by appellant. When a note was renewed, the old one was given to appellant. No representation was ever made to appellant that he would not have to pay the debt or that others would help him pay it. Davenport remembered some discussion about an indemnity agreement, but if one existed he did not know what became of it. He testified to a conversation he had with appellant and appellant's attorney to the effect that appellant would just as soon pay the note and be done with it but he would like to get it deducted from his income tax and the attorney said the Internal Revenue people were objecting. Appellant does not deny this conversation. His attorney in rebuttal did not deny it, but fixed the date of it as September 13, 1960. At that time, it would have referred only to the $14,000 note, which was

later reduced to $13,000 and then consolidated into the present indebtedness.

Appellant does not question the execution of the note nor contend that he misunderstood what he was doing when he signed the guaranty. He does not deny that the bank actually advanced the money represented by the note, nor is there any dispute that said funds were used for the exclusive benefit of the baseball club known as "Valentine Hearts." His position is that he was fraudulently misled by Davenport when he signed as guarantor on the note dated July 16, 1963, and its subsequent renewals. On the affirmative issues raised herein, appellant had the burden of proof. Verdict was directed against him at the close of all of the evidence.

"A motion for directed verdict or its equivalent must for the purpose of decision thereon be treated as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence." Presho v. J. M. McDonald Co., 181 Neb. 840, 151 N. W. 2d 451.

To give the appellant the benefit of the presumptions and inferences to which he is entitled, we assume that Davenport reported to appellant that an indemnity agreement with about 40 or 42 signatures was in existence on July 16, 1963, when the $13,000 note to cover the three small notes was executed; when the 1956-1959 indebtedness was consolidated with it; and at the time the note involved herein was last renewed. In this connection, however, it is difficult to understand what defense appellant had to the $13,000 indebtedness remaining from the 1956-1959 operation which he had been renewing and paying and which is now included as a part of the present obligation. Even if the indemnity agreement was in existence, it would not cover that indebtedness.

It is appellant's position that Davenport was the chief

executive officer of the bank, and that the bank is bound by his actions in deceiving appellant into believing that an indemnity agreement with 40 signers was in existence when he executed the guaranty of July 16, 1963. It is also true that Davenport, along with Dam and appellant, was a director of Valentine Hearts, Inc. It is appellant's position that Davenport and Dam were to handle the securing of the finances for the current year by the indemnity agreement, and that he was to handle the operation of the club, "carry the ball" as he phrased it.

Appellant at all times knew that he was guaranteeing the debt when he signed the guaranty. He was an experienced businessman and must have known that he could be called upon to make the guaranty good. His experience with the previous indebtedness, and the conversation which his own counsel concedes took place September 13, 1960, compels this conclusion. Without reference to its materiality herein, it is of more than passing interest that appellant testifies to knowingly executing and subscribing a false financial statement to support his guaranty of the note involved.

The existence of an indemnity agreement would not prevent the bank from collecting in full on appellant's guaranty. The agreement was never intended to protect the bank. The bank was relying upon appellant's credit and not that of anyone who may have signed an agreement to indemnify him. The effect of the agreement would only be to provide appellant with a method of retrieving some of his money by an action against the indemnitors after he had paid the bank. The president of a bank has no authority, springing from his official position, to make an agreement that the liability of a party on commercial paper payable to the bank shall never be enforced. Security Savings Bank v. Rhodes, 107 Neb. 223, 185 N. W. 421, 20 A. L. R. 412.

In securing signatures on an indemnity agreement, would Davenport be acting as agent for the bank or for the benefit of appellant and Valentine Hearts, Inc., of

which, with appellant, he was a director? While not an analogous situation, the following from Farmers Nat. Bank v. Ohman, 112 Neb. 491, 199 N. W. 802, is of interest herein: "In an action on a promissory note by the payee against the maker, the latter set up as a defense that at the time he made the note he was orally promised by the president and the cashier of the bank that he was not to be liable thereon. The making of such a promise, if it could be proved, was not, under the facts disclosed, within the apparent scope of these officers' authority, and is not binding on the bank, unless specially authorized, or with knowledge of the fact, approved by the bank's directors.

"An agreement pleaded as a defense to an action on a promissory note, brought by the payee bank, that at the time of its execution and delivery it was agreed between the payor and the payee that the note was to be used for the sole purpose of enabling the payee bank to satisfy the demands of the national banking authorities then being made upon it, does not constitute a defense; the fraud, if any, being in this agreement, and not in the note, nor in the consideration for it."

It would appear to us that the bank is the innocent party in this transaction. While appellant's negligence is not an issue, he did know that he and other interested individuals had never seen or signed any indemnity agreement. A defrauded party must be diligent and prudent in his effort to detect the fraud, and means of knowledge thereof are equivalent to knowledge. Abels v. Bennett, 158 Neb. 699, 64 N. W. 2d 481. Any diligence on appellant's part before the end of the 1963 baseball season would undoubtedly have resulted in some signers on the agreement. Why a businessman of appellant's apparent stature would execute guarantees over a period of more than 18 months without insisting upon the production of the indemnity agreement under the circumstances, if it was the moving consideration for him, is hard to comprehend.

Appellant predicates his defense on the theory that there was fraud in the inception of the indebtedness herein. The parties devote much of their briefs to a discussion of whether the bank was a holder in due course. Suffice it to say the bank is not a holder in due course, but that issue is immaterial herein. A renewal note in the hands of the original payee is subject to all the defenses which could be made against the original note. In Nebraska State Bank v. Walker, 111 Neb. 203, 196 N. W. 128, we held: " 'The taking of a new note for an existing note is a renewal of the old indebtedness, and not a payment of the debt, unless there is a specific agreement between the parties that the new note shall extinguish the original debt. As between the original parties and as against transferees who are not bona fide purchasers for value, a renewal note is open to all defenses which might have been made against the original note.' "

Appellant places the inception of the fraud as July 16, 1963, the day he executed the note for $13,000 to consolidate the three previous notes of $2,000, $5,000, and $6,000. July 16, 1963, was not the inception of the indebtedness. It began with the execution of the first note of $2,000. If that note was guaranteed by appellant, there would be no fraud in the inception of the transaction. Appellant's testimony is that *he does not remember* whether he guaranteed these three notes. Davenport's testimony is that the notes were guaranteed. Appellant had the burden of proof on that issue. His failure to remember does not meet that burden. On the record herein, we must conclude that those notes were guaranteed by the appellant. Davenport also testified that it was an invariable custom of the bank when a note was renewed to deliver the old note to the maker. Appellant concedes that this was done with his personal and business notes, but has no recollection that the baseball notes were returned to him. On the record herein, we assume that they were.

The appellant had the burden of proof herein. He did

not meet that burden. The trial court correctly directed a verdict herein, and the judgment is affirmed.

AFFIRMED.