BANK OF VALLEY, A CORPORATION, APPELLEE, v.
WILMER H. MATTSON, APPELLANT.

339 N.W.2d 923

Filed November 10, 1983. No. 82-673.

David J. Lanphier of McGill, Koley, Parsonage & Lanphier, P.C., for appellant.

Richard J. Butler of Ginsburg, Rosenberg, Ginsburg, Cathcart, Curry & Gordon, for appellee.

BOSLAUGH, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

The Bank of Valley, plaintiff below and appellee in this court, sued Wilmer H. Mattson, defendant-appellant, on a promissory note issued to it by Mattson. Mattson counterclaimed, praying, inter alia, that his note be reformed such that it be between the bank and its former president, Peter Heintzelman. Mattson appeals from the order of the trial court which, at the close of defendant's evidence, directed a verdict against him on the bank's petition and dismissed his counterclaim. We reverse and remand for a new trial.

Mattson's single assignment of error is that the trial court improvidently directed a verdict for the bank.

The trial court's actions must be tested in accordance with the rule that a motion for directed verdict is to be treated as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *In re Estate of Thompson*, 214 Neb. 899, 336 N.W.2d 590 (1983).

As presented by the defendant's evidence, the facts are that in the early part of January 1977 Heintzelman approached Duane Shunk, a Valley businessman and longtime customer of the bank, and asked if Shunk could help Heintzelman raise money. Heintzelman told Shunk he needed $75,000 to clear up his personal financial problems and that

he could repay the loan as soon as he received his share of his deceased mother's estate. He represented to Shunk that he was to receive a share of the proceeds of the sale of some farmland which was an asset of the estate. Shunk then approached Don Rogert, another Valley businessman, and Mattson, a onetime Valley businessman, and told them of Heintzelman's difficulty. Eventually, the three of them agreed to help by lending Heintzelman $25,000 each.

On February 22, 1977, Rogert and Shunk went to the bank and executed promissory notes in its favor. Shunk executed a $25,000 note, and Rogert, in his capacity as an officer of Lake Aero, Inc., executed a $50,000 note. They then gave Heintzelman a $25,000 and a $50,000 check, respectively. In return, Heintzelman executed his personal promissory notes to Rogert and Shunk.

The next day, Mattson, who had been out of town on the 22d, went to the bank, signed a $25,000 note in its favor, gave Heintzelman a $25,000 check with the payee designation blank, and received Heintzelman's note for $25,000. Although the payee designation on the check was left blank, the funds were intended to be disbursed to Rogert or Lake Aero, Inc., in order to reduce Rogert's $50,000 debt to $25,000 and thereby leave Shunk, Rogert, and Mattson each in the position of being owed $25,000 by Heintzelman and each owing $25,000 to the bank.

At the time Heintzelman approached Shunk he was indebted in the amount of nearly $350,000. He had, as coexecutor of his mother's estate, mortgaged farmland held by the estate to secure loans to the estate. He had also loaned money to the estate in his role as bank president and borrowed it in his role as coexecutor. These loans were in excess of the bank's legal lending limit, and Heintzelman was under pressure from the bank to reduce that indebtedness. Proceeds from these loans to the estate were transferred to Heintzelman's personal account

and were then used for his personal affairs, in particular to cover margin calls resulting from heavy losses in the commodities market.

On February 23, 1977, after the funds of Shunk, Rogert, and Mattson had been received, Heintzelman transferred approximately $74,000 to the bank in order to reduce the estate's indebtedness to $38,000, well within the bank's legal lending limit. On February 25, 1977, after a meeting with Bob Pease, then vice president of the bank, Kermit Wagner, who was heavily involved in managing the bank's affairs, asked for and received Heintzelman's resignation.

On March 18, 1977, a meeting was held among Pease, who eventually replaced Heintzelman as president of the bank, and the three debtors of the bank, Shunk, Rogert, and Mattson. At that meeting the three debtors were requested to sign a statement absolving the bank of any liability. They refused. At this meeting Mattson, feeling bound to Rogert, instructed that his $25,000 check be completed to reflect Lake Aero, Inc., as payee.

No payment from Heintzelman has been received by Mattson on Heintzelman's $25,000 note to him.

The relevant provision of the Uniform Commercial Code governing recovery in a suit based upon a promissory note is Neb. U.C.C. § 3-307 (Reissue 1980), which provides in pertinent part: "(2) When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense.

"(3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course."

It is clear from the record that the bank produced Mattson's note and that the genuineness of Mattson's signature is not at issue. It is similarly clear that the bank is a "holder" as that term is defined by

Neb. U.C.C. § 1-201(20) (Reissue 1980). A "holder" is one "who is in possession of . . . an instrument . . . issued or indorsed to him or to his order or to bearer or in blank." Once the bank has produced the note and established that it is a holder, it is entitled, under § 3-307(2), to recover unless Mattson establishes a defense. If Mattson establishes a defense, then the bank, in order to prevent the success of such defense, has the burden, under § 3-307(3), of establishing that it is a "holder in due course."

Neb. U.C.C. § 3-302 (Reissue 1980) defines a holder in due course as a holder who takes the instrument for value, in good faith, and without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

Neb. U.C.C. § 3-305 (Reissue 1980) provides that a "holder in due course . . . takes the instrument free from . . . all defenses of any party to the instrument with whom the holder has not dealt . . . ."

In *Bank of Valley v. Shunk, ante* p. 25, 337 N.W.2d 118 (1983), a case arising from the same transactions involved herein, this court held that any fraud by the bank's president, Heintzelman, is attributable to the bank. Therefore, assuming, but not deciding, that the bank is a holder in due course, it nonetheless takes Mattson's note subject to any defenses Mattson may have. This is so because, having ratified the actions of its president, the bank is deemed to have dealt with Mattson. The only question left for our review, therefore, is whether Mattson presented enough evidence, if believed, to establish a defense under § 3-307(2).

The material elements of a fraudulent misrepresentation are that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else was made recklessly; that the representation was made with the intent to deceive and for the purpose of inducing the other party to act upon it; and that such party did, in fact, rely upon the misrepresentation and

was induced thereby to act to his injury or damage. *Flakus v. Schug*, 213 Neb. 491, 329 N.W.2d 859 (1983); *Gitschel v. Sauer*, 212 Neb. 454, 323 N.W.2d 93 (1982).

Sections 531, 533, and 551 of the Restatement (Second) of Torts (1977) are helpful in the analysis of the situation presented by this case. Section 531 provides at 66: "One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."

Section 533 provides at 72-73: "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved."

Section 551 provides at 119: "(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

"(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

"(b) matters known to him that he knows to be

necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

"(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

"(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

"(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

The jury could well find from Mattson's evidence that the bank's president, Heintzelman, perpetrated a fraud upon Mattson. Heintzelman represented that $75,000 would clear up his financial condition, when he was in fact $350,000 in debt. He represented that the estate of his mother would be settled and include the proceeds of the sale of farmland, which was in fact already subject to a mortgage to the bank. While Heintzelman denied making these representations, evidence that he did make them was presented. As such, a question of fact was created for the jury to resolve.

The bank argues that even if there were fraudulent misrepresentations involved, Mattson's reliance upon them was not justified. It contends that Mattson had a duty to investigate. This duty has been defined as one of ordinary prudence. *Erftmier v. Eickhoff*, 210 Neb. 726, 316 N.W.2d 754 (1982); *Department of Banking v. Keeley*, 182 Neb. 645, 156 N.W.2d 803 (1968). Contrary to the bank's argument, this court has stated that one is justified in relying upon a representation made to him as a positive statement of fact, where an investigation would be required to discover its falsity. *Fricke v. Hart*,

206 Neb. 590, 294 N.W.2d 737 (1980); *English v. Bruin Engineering, Inc.*, 201 Neb. 791, 272 N.W.2d 753 (1978). Such investigation would have been required here; thus, Mattson was entitled to rely upon the representations made to him by Heintzelman through Shunk.

The bank also argues that Mattson will suffer no damage until Heintzelman fails to repay the note Heintzelman issued to Mattson and that any claim of injury is speculative, since Mattson has not attempted to collect the $25,000 from Heintzelman.

The plain fact of the matter is that if fraud was perpetrated on Mattson and but for the fraud he would not have entered into the transaction, he would not be in the position of owing $25,000 to the bank. This injury is not speculative, but very real. If Mattson prevails in his attempt to avoid liability to the bank, then the consideration for the note from Heintzelman to him has failed, and Mattson's future attempts to collect on that note could be met by a failure of consideration defense. See *Buffalo County v. Richards*, 212 Neb. 826, 326 N.W.2d 179 (1982).

When one considers the facts in a light most favorable to Mattson, it is clear that questions of fact were created, and if the jury believed Mattson's version, he was entitled to prevail on his defense. As such, the trial court's direction of a verdict in the bank's favor was erroneous and must be reversed. The cause is remanded for a new trial.

We next comment on a procedural matter. Following oral argument, counsel for Mattson attempted to augment his presentation by a letter directed to the members of this court. As correctly observed by counsel for the bank, our rules do not provide for such a procedure, and it is hereby disapproved. Accordingly, the letter of Mattson's counsel is quashed.

REVERSED AND REMANDED FOR A NEW TRIAL.