JAY R. WILSON AND GREGORY G. JENSEN, DOING BUSINESS AS W J ENTERPRISES, APPELLANTS, V. WILLIAM MISKO, APPELLEE.

508 N.W.2d 238

Filed November 19, 1993.    No. S-91-396.

J. Scott Searl and William G. Dittrick, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellants.

Patrick T. O'Brien, of Bauer, Galter, O'Brien & Allan, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

HASTINGS, C.J.

The plaintiffs appeal from a jury verdict in favor of the defendant in this action to recover damages for misrepresentation, securities violations, and fraud and deceit. The action was originally filed in the district court for Douglas County, but upon a request for change of venue, the case was tried in the district court for Valley County.

The plaintiffs' assignments of error combine to assert that the district court erred (1) in failing to rule that defendant, as a matter of law, was a seller or offeror of unregistered securities who is liable to the plaintiffs under Neb. Rev. Stat. § 8-1118(1) (Reissue 1991); (2) in failing to instruct the jury that the defendant could be found liable under § 8-1118(1) if the jury determined the defendant was an offeror of an unregistered security, in failing to instruct the jury on fraudulent

concealment, and in giving its instruction defining "seller" rather than giving the plaintiffs' proposed instruction defining "seller"; (3) in failing to grant the plaintiffs' motions for directed verdict, for order to set aside verdict, for new trial, and for reconsideration of motion for directed verdict; (4) in failing to (a) grant plaintiffs' motion for summary judgment by deeming admitted plaintiffs' requests for admissions, (b) receive defendant's admissions of the plaintiffs' requests for admissions into evidence, and (c) instruct the jury as to facts established by reason of defendant's failure to timely respond to plaintiffs' requests for admissions; and (5) in granting the defendant's motion for change of venue.

The plaintiffs assert that the standard of review with regard to the trial court's legal rulings, the requested jury instructions, the motion for summary judgment, the motion for directed verdict, and the jury verdict on the rescission under § 8-1118(1) of the Securities Act of Nebraska should be de novo on the record. Section 8-1118(1) provides in pertinent part:

Any person who offers or sells a security in violation of section 8-1104 or offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, *shall be liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security*, together with interest at six percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, *upon the tender of the security, or for damages if he no longer owns the security*.

(Emphasis supplied.)

The plaintiffs note that there is apparently no case law in Nebraska addressing the issue of whether a suit under § 8-1118(1) is an action at law or in equity, but argue that a

"reasonable and logical interpretation" of the statute is that a suit to recover consideration paid for a security is a claim for rescission and therefore, in equity. Brief for appellants at 3 n.1. While the plaintiffs assert that their claim was for rescission, their third amended petition, as well as two previously filed petitions, prayed for damages rather than equitable relief.

In its review, an appellate court disposes of an appeal on the basis of the theory presented by the pleadings on which the case was tried. *Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 470 N.W.2d 724 (1991); *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988).

The plaintiffs owned the security at the time of trial, and they then tendered the security to the defendant in accordance with § 8-1118(1). Rescission entails "[a]nnulling, abrogation or unmaking of contract and the placing of the parties to it in status quo." Black's Law Dictionary 1174 (5th ed. 1979). Although one of the issues at trial was whether the defendant was a seller of the security, the defendant did not have title to the security prior to the plaintiffs' purchase, and consideration for the security was made payable to Paradox Energy Program, not to the defendant. Abrogation of the contract would not place the parties in status quo, and thus, it would appear that the relief requested by the plaintiffs would most appropriately be termed damages, as pled, rather than rescission, and de novo review would not apply.

Therefore, we will review this case as an action at law, determining only whether there is credible evidence to support the findings of fact. However, as to matters of law, an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the trial court. *VanDeWalle v. Albion*, 243 Neb. 496, 500 N.W.2d 566 (1993); *Universal Assurors Life Ins. Co. v. Hohnstein*, 243 Neb. 359, 500 N.W.2d 811 (1993).

In reviewing the action of a trial court, we must treat a motion for directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of

every inference which can reasonably be deduced from the evidence. *Humphrey v. Nebraska Public Power Dist.*, 243 Neb. 872, 503 N.W.2d 211 (1993); *Sell v. Mary Lanning Memorial Hosp.*, 243 Neb. 266, 498 N.W.2d 522 (1993).

In order to sustain a motion for directed verdict or for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Humphrey v. Nebraska Public Power Dist., supra*; *Patterson v. Swarr, May, Smith & Anderson*, 238 Neb. 911, 473 N.W.2d 94 (1991).

In 1987, plaintiffs Gregory G. Jensen and Jay R. Wilson and defendant William Misko were residents of Valley County, Nebraska. Jensen and Misko were good friends, and Jensen had served as Misko's attorney on several business matters. Wilson and Misko were also friends and were partners in an underground sprinkler business. In early May 1987, Wilson and Misko traveled to a farm and home show in Kearney, where they had a display for their sprinkler company. While in Kearney, Misko spoke with Tom Clement at the Misko Sporting Goods store. Clement had been employed there, but was in the process of moving from Kearney to Greeley, Colorado. Clement told Misko that he was involved with the Paradox Energy Program and was going to be selling units of that program, which was an oil exploration entity. Misko testified that he became interested in the program because it had the potential for earning a lot of money. While Misko stated that Wilson was also present for the conversation with Clement, Wilson testified that he did not recall seeing Clement that day, but spoke with Misko about investing in the program on their drive from Kearney to Ord.

Misko subsequently attended a seminar in Greeley that dealt with the Paradox Energy Program, and he brought a prospectus home from that meeting. Misko testified that the meeting's sales pitch was very effective and that he became excited about the program. On May 23 or 24, he took the prospectus to Jensen's office and asked Jensen to look it over. He stated that Jensen told him it looked like a legitimate document but that this was not his area of expertise, and he,

Jensen, did not know if it was a good deal or not.

Jensen testified that on June 15, Misko came to his office and told him about "a very good deal" he was going to let Jensen in on. Jensen stated that Misko told him that he had borrowed money to buy a $25,000 unit in the oil venture, that he had "inside contacts and inside information," and that Clement had sold two of the units to his own parents. Jensen testified that he was leery of the investment and asked to see something in writing. According to Jensen, Misko came back a day or two later with a prospectus. Jensen sent the prospectus to his uncle, who had invested in oil wells previously. His uncle ultimately advised him not to invest, because the company was taking too much money in commissions. Jensen said that when he related his uncle's concerns to Misko, Misko replied, "What would you rather have, 97% of nothing or 90% of a million dollars?" Jensen further stated that Misko told him that Misko would receive a finder's fee of one-half of Clement's commission if Jensen bought into a unit.

According to Jensen, Misko arranged another meeting with him and Wilson on June 22. Misko was said to have told him that Wilson wanted to buy into the oil deal, but that it was almost sold out and if they did not take any action that night, they probably would not be able to get into it. By the end of the evening, Wilson and Jensen decided they would "each go into it 50-50," so Jensen wrote out a check for $25,000 and Wilson gave him a check for $12,500. Jensen recalled signing a document at that time which might have been a subscription agreement, but he did not make a copy before he gave the check and document to Misko.

Wilson testified that he borrowed $12,500 from a bank in May 1987 in order to invest as a partner with Misko in the Paradox Energy Program. When Misko later told him that he was not going to invest, Wilson decided he would not invest either and paid the money back to the bank. He stated that he later had a conversation with Misko, on June 22, in which Misko told him that he had decided that the Paradox Energy Program was such a good deal that he "went ahead and borrowed the money to invest in a whole unit of $25,000 himself." Misko then told him that Jensen was interested in

investing and asked if Wilson would want to be Jensen's partner. Wilson went with Misko to Jensen's office, and after some discussion he and Jensen decided they would share in the investment. Wilson also recalled signing a document which might have been a subscription agreement, which was given to Misko. Both Wilson and Jensen testified that they trusted Misko and that in making the investment they relied on Misko's statements that he had invested $25,000 of his own money and that Clement's parents had each bought a unit in the Paradox Energy Program.

Misko testified that Jensen initiated the meeting on June 22. He stated that he told Jensen that Clement's parents were involved in the program, but nothing more specific than that, and also denied telling Jensen and Wilson that he himself had invested. Misko received a check for $1,250 from Bataa Oil, Inc., the parent of Bataa Exploration, Inc., issuer-seller of the Paradox Energy Program, and an IRS Form 1099 indicating the amount of compensation. The compensation was declared as income on his income tax return. However, Misko stated that when he first saw the check, it did not occur to him what it was for, and he called Clement. Clement testified that he received $2,500 for the sale of the unit bought by Jensen and Wilson, and had a check for $1,250 sent to Misko. He testified at the trial that he sent the money to Misko because "Bill and I were always just like kind of partners, and I felt that he is the one that put me in touch with Greg Jensen. He knew him better than I did, so that's why I gave him the money." However, in earlier deposition testimony introduced by the plaintiffs, Clement had stated, "I had a deal with Bill, you know, once he did this, that if everything worked I was going to take care of him on a backside deal, too. And I don't even recall what that was. It was kind of complicated —."

In early November 1988, Jensen received a letter from Bataa Oil, informing him that he needed to invest another $3,000 to complete an oil well. Jensen testified that he was upset because Misko had represented that $25,000 would be the only investment, so he called Misko to ask if he was going to put in his $3,000. Jensen stated that Misko responded that he was not sure. Jensen later spoke with Clement, who told him that Misko

would be sending his money the next day. Jensen further stated that on November 10, Misko came to his office and told him that his father had already sent in the $3,000 and that the unit was in his father's name. However, Jensen said that on that same day he spoke with David Calvin, president of Bataa Oil, who told him that he, Calvin, had overheard the conversation that he had had with Clement and wanted Jensen to know he, Jensen, had been lied to, that neither Misko nor any of his family had invested.

Clement testified that he had told Jensen that Misko had invested, that it was not true, and that Misko had asked him to do that. He later called Jensen back and told him that Misko had not invested, because he "didn't feel it was right." In addition, Clement stated that at the time when they were finishing completion costs, after all the wells had been drilled, Misko told him that he had told Jensen and Wilson that he, Misko, had invested. Misko also admitted asking Clement to lie, in order to "buy time" until the next morning so he could tell Jensen himself that he had not invested.

At the close of the trial, the parties stipulated that any securities at issue were not in fact registered under the Securities Act of Nebraska. The jury found in favor of the defendant on all of the plaintiffs' theories of recovery.

We deal first with the issue of whether the trial court erred in failing to rule that the defendant, as a matter of law, was a seller or offeror of unregistered securities who was liable to the plaintiffs under § 8-1118(1).

The plaintiffs alleged that the defendant was liable for the sale of an unregistered security, pursuant to Neb. Rev. Stat. § 8-1104 (Reissue 1991) ("[i]t shall be unlawful for any person to offer or sell . . .") and § 8-1118(1) ("[a]ny person who offers or sells a security in violation of section 8-1104 . . .") of the Securities Act of Nebraska, and contended that the defendant should have been deemed an offeror or seller of an unregistered security as a matter of law. Neb. Rev. Stat. § 8-1101(10) (Reissue 1991) provides the following definitions:

> Sale or sell shall include every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value. Offer or offer to sell shall include every attempt

or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.

While the act fails to define "seller" or "offeror," the plaintiffs argue that the defendant should be deemed a seller or offeror as a matter of law under § 8-1101(10) because he had numerous conversations with the plaintiffs, enthusiastically discussed his commitment to be involved with the Paradox Energy Program, directed technical questions to Clement or Calvin, and accepted $1,250 for finding and encouraging the plaintiffs' investment.

The foregoing section is almost identical to the language found in 15 U.S.C. § 776(3) (1988) of the Securities Act of 1993:

The term "sale" or "sell" shall include every contract of sale or disposition of a security or interest in a security, for value. The term "offer to sell", "offer for sale", or "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.

In *Pinter v. Dahl*, 486 U.S. 622, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988), the U.S. Supreme Court considered whether one must intend to confer a benefit on himself or a third party in order to qualify as a seller under § 12(1) (now codified as 15 U.S.C. § 77l(1) (1988)) of the Securities Act of 1933. The Court found that under the act's definitions of "sale" or "sell" and "offer," the range of persons potentially liable under § 12(1) was not limited to those who pass title. The Court noted that inclusion of the phrase "solicitation of an offer to buy" within the definition of "offer" brought within the scope of § 12 those who had engaged in solicitation, an activity "not inherently confined to the actual owner." 486 U.S. at 643. While finding that Congress intended § 12(1) liability to extend to those who solicit securities purchases, the Court concluded that Congress did not intend to impose strict liability on one who urges the purchase solely to benefit the purchaser, noting that "[t]he language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." 486 U.S. at 647.

Although the petitioner in *Pinter* urged the adoption of a "substantial factor" test which would impose liability on one " 'whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place,' " 486 U.S. at 649, the Court rejected that test, stating that "§ 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale," 486 U.S. at 650.

The Court concluded that it was not clear in that case whether the respondent had the kind of interest in the sales that made him liable as a statutory seller, and remanded for further proceedings. The Court found inconclusive the fact that the respondent had received no commissions, noting:

> Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as where he "anticipat[es] a share of the profits" . . . or receives a brokerage commission . . . . But a person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under § 12(1) without showing that he expects to participate in the benefits the owner enjoys.

(Citations omitted.) 486 U.S. at 654-55.

Thus, *Pinter* at least suggests that liability as a statutory seller may attach even if no remuneration is involved. The plaintiffs contend that "[t]he Supreme Court's extension of the term 'seller' to situations where compensation has *not* been paid reflects the Court's view that the Securities Act of 1933 should be broadly construed, applied, and interpreted." Brief for appellants at 21. The plaintiffs also argue that the failure to direct a verdict against the defendant would undermine the protective nature of the Securities Act of Nebraska and allow individual sellers without compensation agreements to discuss investments with potential buyers and then "wait to receive 'gifts' of supposedly unsolicited 'income.' " Brief for appellants at 23.

In applying the reasoning of *Pinter* to the facts of this case, we note that the defendant did receive remuneration for his participation in the sale. In determining whether, in soliciting

the purchase, he was motivated by his own financial interests or those of the buyer, we find that the evidence is in conflict regarding the issue of whether the defendant knew or anticipated that he would receive this remuneration. The question squarely before us is whether, whatever the subjective intent of the defendant was, as a matter of law the actual receipt of a commission by a seller is conclusive evidence that the seller was motivated by financial interests other than those of the buyer.

We stated in *Labenz v. Labenz*, 198 Neb. 548, 550, 253 N.W.2d 855, 857 (1977), that "[t]he Securities Act of Nebraska should be liberally construed to afford the greatest possible protection of the public." However, in this case the evidence was also in conflict on the issue of the defendant's actual participation in the sale, and *Pinter* instructs that strict liability should not be imposed on those who are merely collateral to the sale, as opposed to those who actively solicit a purchase.

The defendant testified that Wilson was present for the initial contact with Clement; that Jensen initiated the majority of their conversations about the program; that he never told Wilson and Jensen that he had invested; that Jensen also initiated the meeting of June 22, during which the decision was made to purchase a unit of the Paradox Energy Program; and that he was not expecting compensation. The defendant's credibility is certainly at issue. However, in its order denying the plaintiffs' motion to set aside the verdict, the district court stated:

> The evidence establishes without dispute that the defendant participated in or was present during the time the plaintiffs were considering making the investment and at the time they made it. He encouraged the plaintiffs at least by his interest. The evidence does not establish the defendant's motive was any benefit or gain to anyone other than the plaintiffs, but of course, the evidence would certainly support a finding that the defendant was motivated by his own interest, or that of the sellers. Perhaps, the defendant would be a seller as a matter of law, if the evidence established without dispute that before the plaintiffs made the investment the defendant believed

he would receive compensation of some type if the plaintiffs made the investment. The plaintiffs introduced a great deal of evidence that would support the conclusion he believed he would receive compensation if the plaintiffs made the investment, but I do not think that conclusion is required.

The credibility of witnesses and the weight to be given their testimony are solely for the consideration of the jury. *Pearson v. Richard*, 201 Neb. 621, 271 N.W.2d 326 (1978).

Following *Pinter*, we hold that liability under the Securities Act of Nebraska, Neb. Rev. Stat. § 8-1101 et seq. (Reissue 1991 & Cum. Supp. 1992), extends only to a person who successfully solicits purchase of securities, motivated at least in part by desire to serve his or her own financial interests or those of the securities owner. Therefore, absent de novo review and independent factual findings by this court, and despite policy arguments to the contrary, the district court did not err in failing to find that the defendant was a seller or offeror as a matter of law.

The next issue to be considered is the question of whether the trial court erred in failing to instruct the jury properly. The plaintiffs contend that the district court erred in failing to properly define "seller" and in failing to give an instruction defining "offeror." The district court instructed the jury on "Determining if the Defendant is a Seller" with the following, in instruction No. 6:

For purposes of this action, a person who successfully solicits the purchase of a security when the solicitor is motivated at least in part by a desire earn [sic] a commission or to serve his own financial interest, or the financial interest of a seller. The defendant is not a seller if he merely urges another to make an investment, or if he gives gratuitous advice, even if it is strongly and enthusiastically given.

The following may be considered by you in making this determination:

1. All the facts and circumstances known to the parties at the time of the sale.

2. The words and acts of the defendant or the plaintiffs.

3. The acts and words of the sellers or their representatives with or towards the defendant, the plaintiffs, or either of them.

4. If you find that the defendant knew before the sale that he was or was likely to receive compensation if the plaintiffs invested in Paradox, you should consider that fact.

There may be more than one seller of an investment. Notably, the first sentence of the instruction fails to include the crucial phrase "is a seller." The defendant argues the applicability of *Greenberg v. Bishop Clarkson Memorial Hospital*, 201 Neb. 215, 266 N.W.2d 902 (1978), in which we found that an inadvertent grammatical error in an instruction is harmless error if it is clear from the instruction itself and the other instructions given that the jury was not misled. However, in *Greenberg*, one instruction contained a misplaced phrase regarding a physician's applicable standard of care, while six separate instructions correctly informed the jury of the appropriate standard. Such was not the case here. Since instruction No. 6 was the only instruction which defined "seller" and since the jury's understanding of the term "seller" was critical, the error in failing to correctly define "seller" cannot be considered harmless.

An instruction that misstates the issues or defenses and has a tendency to mislead the jury is erroneous. *Omaha Mining Co. v. First Nat. Bank*, 226 Neb. 743, 415 N.W.2d 111 (1987); *Zimmerman v. Continental Cas. Co.*, 181 Neb. 654, 150 N.W.2d 268 (1967).

Further, § 8-1118(1) makes it clear that liability may be imposed on either an offeror or a seller: "Any person who *offers* or *sells* a security in violation of section 8-1104 . . . shall be liable to the person buying the security from him . . . ." (Emphasis supplied.) As discussed above, "[s]ale or sell" and "[o]ffer or offer to sell" are separately defined in § 8-1101(10), and we presume they are to be considered separately as well.

Effect must be given, if possible, to all the several parts of a statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided. *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990);

*NC+ Hybrids v. Growers Seed Assn.*, 219 Neb. 296, 363 N.W.2d 362 (1985).

While "sell" and "offer" are two separate concepts, the instruction, as given, apparently attempts to merge the two into one, and as a result, correctly defines neither. Again, *Pinter v. Dahl*, 486 U.S. 622, 108 S. Ct. 2063, 100 L. Ed. 2d (1988), is instructive as to the distinction between a seller and an offeror. Noting that the statutory terms "offer" and "sell" are expansive enough to encompass the entire selling process, including the seller/agent transaction, the Court stated:

> Determining that the activity in question falls within the definition of "offer" or "sell" in § 2(3), however, is only half of the analysis. The second clause of § 12(1), which provides that only a defendant "from" whom the plaintiff "purchased" securities may be liable, narrows the field of potential sellers. Several courts and commentators have stated that the purchase requirement necessarily restricts § 12 primary liability to the owner of the security. . . . In effect, these authorities interpret the term "purchase" as complementary to only the term "sell" defined in § 2(3). Thus, an offeror, as defined by § 2(3), may incur § 12 liability only if the offeror also "sells" the security to the plaintiff, in the sense of transferring title for value. . . .
>
> We do not read § 12(1) so restrictively. The purchase requirement clearly confines § 12 liability to those situations in which a sale has taken place. Thus, a prospective buyer has no recourse against a person who touts unregistered securities to him if he does not purchase the securities. . . . The requirement, however, does not exclude solicitation from the category of activities that may render a person liable when a sale has taken place. A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would commonly be said, and would by thought by the buyer, to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title.

(Citations omitted.) 486 U.S. at 643-44.

Thus, while "seller" and "offeror" are distinct concepts, liability may be predicated on each, and as such, each should have been separately and correctly defined for the jury.

The proper method of presenting a case to a jury in its instructions is by a clear and concise statement by the trial court of the issues which find support in the evidence. *Krehnke v. Farmers Union Co-Op. Assn.*, 199 Neb. 632, 260 N.W.2d 601 (1977); *Nebraska State Bank v. Dudley*, 194 Neb. 1, 229 N.W.2d 559 (1975).

It is the duty of the trial court to instruct on the proper law of the case, and failure to do so constitutes prejudicial error. *Professional Recruiters v. Oliver*, 226 Neb. 16, 409 N.W.2d 304 (1987); *State v. Clayburn*, 223 Neb. 333, 389 N.W.2d 314 (1986).

The instruction given by the trial court failed fully to instruct on the proper law of the case relating to the concepts of "seller" and "offerer," to the detriment of the plaintiffs.

The plaintiffs next assert that the trial court erred in failing to instruct the jury that the defendant could be held liable for fraudulently concealing material information from the plaintiffs.

In count V of their third amended petition, subtitled "Common Law Fraud and Deceit," the plaintiffs alleged that the defendant's misrepresentations and nondisclosures were material, known to be untrue or recklessly made or omitted, and made with the intention that the plaintiffs rely upon the same. It was further alleged that in reliance upon the misrepresentations and nondisclosures, and as a direct and proximate consequence, the plaintiffs were damaged by being left with a totally depreciated investment which they were fraudulently induced to acquire.

In *Security Inv. Co. v. State*, 231 Neb. 536, 549-50, 437 N.W.2d 439, 448 (1989), quoting *Nelson v. Cheney*, 224 Neb. 756, 401 N.W.2d 472 (1987), this court reiterated the elements of fraud by concealment:

"(1) that the defendant concealed or suppressed a material fact; (2) that the defendant had knowledge of this material fact; (3) that this material fact was not within the reasonably diligent attention, observation, and judgment

of the plaintiff; (4) that the defendant suppressed or concealed this fact with the intention that the plaintiff be misled . . . (5) that the plaintiff was reasonably so misled; and (6) that the plaintiff suffered damage as a result."

The plaintiffs assert that testimony revealed that the defendant concealed information from them concerning his failure to purchase Paradox Energy Program securities. There is ample evidence in the record to support this assertion. Although the defendant denied making any affirmative representation to the plaintiffs that he had invested, a jury could have found that the defendant made such representations or had, at the very least, concealed the fact that he had *not* invested, based on his own admission that he told Clement, "I knew Greg was under the impression that I had invested." Whether the nondisclosures were material, whether the plaintiffs' reliance was reasonable, and whether the defendant had the requisite intent were questions for the jury.

Based on this court's citations from Restatement (Second) of Torts § 551 (1977) in *Bank of Valley v. Mattson*, 215 Neb. 596, 339 N.W.2d 923 (1983), a case involving fraudulent misrepresentation, the plaintiffs submitted a proposed jury instruction on the law of fraudulent concealment, which stated:

> With regard to whether or not the Defendant fraudulently concealed any information from the Plaintiffs, you are instructed that under the law of the State of Nebraska, a party to a business transaction has a duty to exercise reasonable care to disclose subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and further has a duty to disclose facts basic to the transaction, if he knows that the other party is about to enter into the transaction under a mistake as to them, and that the other party, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden of showing that (1) the tendered instruction is a correct statement of the

law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993); *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990).

While the tendered instruction is not necessarily an incorrect statement of the law, neither is it wholly correct, since it does not encompass a complete recital of the elements of fraudulent concealment, which have been delineated above. However, whether requested to do so or not, the trial court has the duty of instructing the jury on issues presented by the pleadings and the evidence. *Worth v. Schillereff*, 233 Neb. 628, 447 N.W.2d 480 (1989); *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988).

Because of this duty, the trial court, on its own motion, must correctly instruct on the law, and this court may take cognizance of plain error in instructions indicative of a probable miscarriage of justice. *Silvey & Co., Inc. v. Engel*, 204 Neb. 633, 284 N.W.2d 560 (1979); *Barta v. Betzer*, 190 Neb. 752, 212 N.W.2d 352 (1973).

Thus, while the plaintiffs' proposed instruction was insufficient, the district court failed to give an instruction on fraudulent concealment which would have been justified by the pleadings and the evidence.

The plaintiffs next assert that the defendant's failure to timely respond to their requests for admissions constituted an admission of the subject matter of the requests and that the district court erred in refusing to grant the plaintiffs' motion for summary judgment.

Matters admitted pursuant to Neb. Ct. R. of Discovery 36 (rev. 1992) are a proper basis for a summary judgment. *Wibbels v. Unick*, 229 Neb. 184, 426 N.W.2d 244 (1988). However, we recently reiterated in *Petska v. Olson Gravel, Inc.*, 243 Neb. 568, 500 N.W.2d 828 (1993), that a denial of a motion for summary judgment is not a final order and therefore is not appealable. Nevertheless, the plaintiffs also assign as error the district court's failure to admit the defendant's admissions as evidence and to instruct the jury accordingly.

In regard to requests for admissions, rule 36(a) states:

Each matter of which an admission is requested shall be separately set forth by the party making the request, and shall be repeated by the responding party in the answer or objection thereto. The matter is admitted unless, within thirty days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by his or her attorney . . . .

The plaintiffs served the defendant with "Requests for Admissions, Interrogatories and Request for Production of Documents" on September 27, 1989. On October 18, 1989, the defendant filed in the district court for Douglas County an "Objection to Further Discovery and Notice of Hearing," in which the defendant objected to further discovery because of a pending criminal prosecution on two complaints filed against the defendant in Valley County and stated that "he cannot effectively answer the discovery requests of the Plaintiffs without impinging upon his defense of the criminal matters." The defendant further requested that discovery be continued until the criminal matters were resolved. A hearing on the defendant's objection was scheduled for November 16, 1989. The docket sheet for the district court for Douglas County contains a notation entered on November 16, 1989, which states: "Motion to stay Discovery argued & taken under advisement. On this date after review of the brief & law, the Court finds said Motion is overruled."

The defendant's answers were subsequently served on November 28, 1989, and in response to the "Requests for Admissions," it was stated therein that "Defendant hereby objects and refuses to answer the Request for Admissions numbered 1 through 9 propounded upon him by Plaintiffs and hereby asserts his Fifth amendment privilege against self-incrimination as the basis for his objection and refusal to answer." Based on the same objection, the defendant similarly refused to answer the plaintiffs' interrogatories and request for production of documents.

The plaintiffs argue that since the defendant did not serve

answers to the plaintiffs' requests until November 28, the answers were not timely and thus the requests were admitted pursuant to rule 36(a). Accordingly, the plaintiffs assert that with the admission of the requests they were entitled to prevail on their motion for summary judgment because no issue of material fact existed and thus they were entitled to judgment as a matter of law.

At trial before the district court for Valley County, the plaintiffs offered the requests and answers into evidence as exhibit 20 prior to calling their first witness. In response to the plaintiffs' argument that the answers were not timely served, the court found that the objection filed on October 18 should be treated as an objection within 30 days under rule 36, and sustained the defendant's objection to treating the answers as an admission and to the admission of exhibit 20.

The action by the court in Valley County in overruling, in effect, the earlier ruling by the Douglas County court, was not prohibited under any theory of res judicata. The earlier ruling was preliminary in nature and the court which actually tried the case was free to make its own rulings on evidence.

The effect of the Valley County court's ruling was to extend the period of time in which the defendant must answer the requests for admissions and to sustain the defendant's objection. In *Arcadia State Bank v. Nelson*, 222 Neb. 704, 386 N.W.2d 451 (1986), a defendant that had not requested additional time to answer requests for admissions was nevertheless granted additional time by the district court. This court noted that "it is generally true that permission to either amend pleadings or have additional time in which to answer requests for admission is addressed to the sound discretion of the trial court, and absent an abuse of discretion will not be reversed," *id.* at 716, 386 N.W.2d at 460, but found that in the specific case the district court had abused its discretion in granting additional time and should have sustained the plaintiff's motion to have the answers deemed admitted.

In order to understand the ruling in the case, it is necessary that we examine that opinion in greater detail. In holding that the trial court abused its discretion in granting the defendant additional time in which to respond for the request for

admissions, the court pointed out that

> Jerry Nelson already had more than 5 months to file answers, had failed to appear at any hearing, and had filed only a general denial. Furthermore, he had not asked for additional time to file answers to the Bank's request for admission. He had displayed a complete lack of interest in the case, just as he did in this court.

*Id.* at 717, 386 N.W.2d at 460.

In the case presently before the court, the defendant had filed objections in what the trial court implicitly found to be a timely manner; upon the objections' being overruled, he filed a specific objection on the basis of the Fifth Amendment within 12 days. The trial court saw fit to treat the response as timely and as effective and sustained the objections to declaring the requests for admission as having been admitted. The court did not abuse its discretion in this regard.

In *Kramer v. Levitt*, 79 Md. App. 575, 558 A.2d 760 (1989), *cert. denied* 317 Md. 510, 564 A.2d 1182, a civil case, the appellant responded to the appellee's request for admissions by invoking the Fifth Amendment. At trial, the appellee's counsel argued that since the appellant had neither denied nor admitted the admissions, Md. Rule 2-424(b) (substantially the same as rule 36(a)) required that they should be deemed admitted and conclusively established. The trial court allowed the appellee's counsel to read the requests for admissions to the jury, noting that the assertion of the privilege against self-incrimination was available to the appellant, affording him the protection of the Constitution, but that it did not protect him from the rules of civil procedure, which provided that where an admission is requested and it is neither admitted nor denied, it should be taken as admitted.

On appeal, the appellant argued that the trial judge erred in allowing the appellee's requests for admissions to be deemed admitted and read to the jury. The appellate court agreed, noting:

> Though by its terms applicable only in criminal proceedings, the Fifth Amendment privilege against self-incrimination has long been held to be properly asserted by parties or witnesses in civil proceedings.

*McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). The privilege may be invoked by anyone whose statements could incriminate him, either by directly admitting the commission of illegal acts or by relating information which would "furnish a link in the chain of evidence needed to prosecute the claimant." *Hoffman v. United States*, 341 U.S. 479, 486-87, 71 S.Ct. 814, 818-19, 95 L.Ed. 1118 (1951). The privilege protects persons "against being forced to make incriminating disclosures at any stage of the proceeding if they could not be compelled to make such disclosures as a witness at trial." *National Acceptance Co. of America v. Bathalter*, 705 F.2d 924, 927 (7th Cir.1983). It therefore applies not only at trial, but at the discovery stage as well. *See Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973); *United States v. Kordel*, 397 U.S. 1, 7, 90 S.Ct. 763, 766, 25 L.Ed.2d 1 (1970).

79 Md. App. at 582-83, 558 A.2d at 764. The appellate court found that by invoking the Fifth Amendment, the appellant had complied with the directive of rule 2-424(b) that a party responding to a request for admissions must specify an objection, admit or deny the matter. Quoting *Mayo v. Ford*, 184 A.2d 38 (D.C. 1962), *rev'd on other grounds* 191 A.2d 603 (D.C. 1963), the court further noted that " 'the Fifth Amendment protection against compelled self-incrimination would be meaningless and hollow if the objective sought through the asking of the question could be achieved as well by a refusal to answer as by the answer itself.' " 79 Md. App. at 584-85, 558 A.2d at 765. Although the court found that the appellant's refusal to respond to the requests for admissions could not be considered evidence of the truth of the matters stated therein, it considered what effect the appellant's claim of the Fifth Amendment had on the subsequent litigation of the civil case.

The Maryland court noted that in examining a prisoner's refusal to testify at a prison disciplinary hearing, the U.S. Supreme Court, in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976), found that a disciplinary hearing is a civil action and that " 'the Fifth Amendment does

not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a *party to a civil cause.*" ' " (Emphasis in original.) *Kramer v. Levitt,* 79 Md. App. at 585, 558 A.2d at 766, quoting *Baxter v. Palmigiano, supra,* quoting 8 John H. Wigmore, Evidence in Trials at Common Law § 2272(1)(e) (John T. McNaughton rev. 1961). The court went on to find that *Baxter* suggests three criteria which must be met in order to permit an inference to be drawn against a person exercising his privilege against self-incrimination, i.e., the action must be a civil action, the party seeking to draw the inference must have established a prima facie case, and the person must be a party and not a mere witness. The Maryland court concluded that it would have been constitutionally permissible under *Baxter* for the trial judge to have allowed the appellee to read the requests for admissions to the jury. The court should then have instructed the jury that the appellant objected to answering by relying on his constitutional privilege against self-incrimination and that the jury could, but need not, draw an adverse inference from the appellant's assertion of the privilege.

In *State ex rel. Schuler v. Dunbar,* 208 Neb. 69, 74-75, 302 N.W.2d 674, 678 (1981), this court stated: "We note also that where a defendant in a civil case refuses to testify on the ground that the evidence may incriminate him, the trier of fact may draw an adverse inference from his refusal." See, also, *U.S. v. Sack,* 118 F.R.D. 500 (D. Neb. 1987) (it is not a deprivation of rights to require a litigant to choose between invoking the Fifth Amendment privilege in a civil case, thereby risking a loss, or alternatively answering the questions, thus risking criminal prosecution).

The Maryland court also held:

> We adopt this reasoning and hold that when a defendant in a civil action pleads his privilege against self-incrimination in response to discovery requests, he is prohibited from testifying at trial on matters pertaining to these requests. [Citations omitted.] He is not precluded, however, from producing independent witnesses to prove

any defenses raised if he complies with the appropriate discovery rules.

79 Md. App. at 588, 558 A.2d at 767.

Although the trial court did not abuse its discretion in failing to treat the requests for admissions as having been admitted, we hold that where a party served with requests for admissions refuses to respond, relying on the constitutional privilege, the offering party may introduce the requested admissions in evidence and the court must instruct the jury that it could, but did not have to, draw adverse inferences from the responding party's refusal to answer. It was error for the trial court not to have done so in this instance.

As their final assignment of error, the plaintiffs assert that the district court for Douglas County erred in granting the defendant's motion for an order changing venue from the district court for Douglas County to the district court for Valley County.

Neb. Rev. Stat. § 25-403.01 (Reissue 1989) provides:

Any action, other than actions mentioned in sections 25-401 to 25-403, may be brought (1) in the county where any defendant resides, (2) in the county where the cause of action arose, (3) in the county where the transaction or some part of the transaction occurred out of which the cause of action arose, or (4) if all defendants are nonresidents of this state, in any county. When an action has been commenced in any other county, the court in which the action has been commenced shall have jurisdiction over the action, but upon timely motion by a defendant, the court shall transfer the action to the proper court in a county in which such action might have been properly commenced. The court in the county to which the action is transferred, in its discretion, may order the plaintiff or the plaintiff's attorney to pay to the defendant all reasonable expenses, including attorney's fees, incurred by the defendant because of the improper venue or in proceedings to transfer the action.

The plaintiffs claim that the defendant's motion was not timely because it was filed on July 16, 1990, after the filing of the plaintiffs' third amended petition and prior to trial, but

approximately 17 months after the filing of the plaintiffs' first petition. Relying on *Peitz v. Hausman*, 198 Neb. 344, 252 N.W.2d 628 (1977); *Blitzkie v. State*, 228 Neb. 409, 422 N.W.2d 773 (1988); and *Corn Belt Product Co. v. Mullins*, 172 Neb. 561, 110 N.W.2d 845 (1961), the plaintiffs argue that the matter of improper venue in a transitory action must be raised in the answer or earlier, or it is waived.

Where the record does not show an abuse of discretion, a ruling on a motion to transfer venue will not be disturbed on appeal. *Everlasting Golden Rule Ch. v. Dakota Title*, 230 Neb. 590, 432 N.W.2d 803 (1988); *Johnsen v. Parks*, 189 Neb. 712, 204 N.W.2d 804 (1973).

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Wulff v. Wulff*, 243 Neb. 616, 500 N.W.2d 845 (1993); *Pendleton v. Pendleton*, 242 Neb. 675, 496 N.W.2d 499 (1993).

There is nothing in the record which would indicate that the district court's decision was untenable or unfairly deprived the plaintiffs of a substantial right or a just result. Neb. Rev. Stat. § 25-410 (Reissue 1989) provides that "[f]or the convenience of the parties and witnesses or in the interest of justice, a district court of any county may transfer any civil action to the district court of any other county in this state." According to the plaintiffs' "Objection to Motion for Change of Venue," the plaintiffs' counsel and the defendant's previous counsel had agreed that the case should be tried in Douglas County. However, this action would properly have been filed in Valley County, since it is the county where the defendant resided and where the cause of action arose. Although one of the plaintiffs resided elsewhere at the time of trial, the other plaintiff and two witnesses were residents of Valley County; two other witnesses were from Greeley, Colorado. Where there has been no showing of prejudice to the plaintiffs, the trial court did not abuse its discretion in granting the motion for change of venue.

Because of the errors noted above, the judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

CAPORALE, J., not participating.

WHITE, J., concurring.

I agree with the opinion except for the portion holding that the person selling must be motivated by private gain in order to be covered by Neb. Rev. Stat. § 8-1101(10) (Reissue 1991). No language is present in the statute which logically requires that interpretation.